AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original    ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT
10/1/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: ___CDO___ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT
10/1/2024
CENTRAL DISTRICT OF CALIFORNIA
BY Valencia Munroe DEPUTY

| | |
|---|---|
| United States of America | |
| v. | |
| BAHRAM HASSANSHAHI,<br>  aka "Persian Sean," | Case No.    2:24-mj-06011-DUTY |
| Defendant | |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

As described in the accompanying attachment, defendant violated the following statutes:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1343, 1349, 1028A,<br>21 U.S.C. § 846 | Wire Fraud Conspiracy, Aggravated<br>Identity Theft, Conspiracy to<br>Distribute Controlled Substances |

This criminal complaint is based on these facts:

 *Please see attached affidavit.*

☒ Continued on the attached sheet.

/s *Lyndon Versoza*
_____
*Complainant's signature*

Lyndon Versoza, Postal Inspector
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:     10/1/24
_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Charles Eick, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA Andrew Brown, 11th Floor, x0102

**Complaint Attachment**

Count One, 18 U.S.C. § 1349

Beginning in or before 2021, and continuing through at least November, 2022, in Los Angeles County, within the Central District of California, and elsewhere, defendant BAHRAM HASSANSHAHI, aka "Persian Sean" ("Defendant"), and others, conspired to commit wire fraud, in violation of Title 18, United States Code, Section 1343.  Defendant and his co-conspirators would steal the identities of victim property owners, forge power of attorney forms in their names, and then sell their properties without their knowledge or consent, and share the proceeds.  In furtherance of this conspiracy, defendant received at least $180,000 in proceeds from the theft of victim Robert Tascon's house. Defendant and his co-conspirators used interstate wires to defraud their victims throughout this conspiracy.

Count Two, 18 U.S.C. § 1028A

Beginning in or before 2021, and continuing through at least November, 2022, in Los Angeles County, within the Central District of California, and elsewhere, defendant BAHRAM HASSANSHAHI, aka "Persian Sean," knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person during and in relation to a felony violation of Title 18, United States Code, Section 1349, Conspiracy to Commit Wire Fraud, as charged in Count One, knowing that the means of identification belonged to another actual person.

Count Three, 21 U.S.C. § 846

Beginning in or before 2023, and continuing through the present, in Los Angeles County, within the Central District of California, and elsewhere, defendant BAHRAM HASSANSHAHI, aka "Persian Sean," conspired with others to knowingly and intentionally distribute methamphetamine, a Schedule II controlled substance, and N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl ("fentanyl"), a Schedule II narcotic drug controlled substance, both in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C).

**AFFIDAVIT**

I, Lyndon A. Versoza, being duly sworn, hereby depose and state as follows:

  **I.** <u>**TRAINING AND EXPERIENCE**</u>

  1. I am a United States Postal Inspector employed by the United States Postal Inspection Service ("USPIS"), Los Angeles Division, in Los Angeles, California, where I have served since June 2005.  I have been a federal law enforcement officer since 2002.  Currently, I am assigned to the USPIS Contraband Interdiction and Investigations Team in Los Angeles, California, where I am designated as a Money Laundering Specialist. In this capacity, I am responsible for investigating criminal violations of money laundering and structuring laws, such as when the services of the United States Postal Service are employed by criminals as part of the means to launder or conceal illicit funds, and/or avoid financial reporting requirements.  I am also one of seven Postal Inspectors in the U.S. currently designated by USPIS as a Subject Matter Expert ("SME") in money laundering investigations.  As a SME, I have spoken at money laundering conferences and provided training to my colleagues, the financial and banking industry and other law enforcement agents. I have also received both formal and informal money laundering training from USPIS and other government and private agencies.

During the course of my career, my money laundering investigations have led to the successful seizure of assets valued at hundreds of millions of dollars. During my approximately 19-year career as a Postal Inspector, I have investigated: thieves, burglars, rapists, mass-shooters, murderers, armed robbers, prison and street gangs, drug trafficking organizations, and perpetrators of financial violations (including money launderers, darknet vendors, digital currency launderers, identity thieves and fraudsters). For approximately five years, prior to investigating money laundering, I was assigned to investigate child exploitation and sex trafficking. In that assignment, I worked both independently and in a task force where I led and participated in investigations related to crimes involving the exploitation of children and sex trafficking domestically and internationally. In that capacity, I also earned a designation by USPIS as a SME in Child Exploitation Investigations.

2. From 2002 to 2005, prior to my service as a US Postal Inspector, I served as a law enforcement officer with the US Immigration and Naturalization Service, which later became part of the US Department of Homeland Security. In this capacity I enforced immigration and customs law at an international airport and seaport, and later, worked in an intelligence unit for local and national counterterrorism and smuggling operations.

- 2 -

3.    I am familiar with the facts and circumstances described herein.  This affidavit is based upon my personal involvement in this investigation, my training and experience, and information obtained from various law enforcement personnel and witnesses, including information that has been reported to me either directly or indirectly.  This affidavit does not purport to set forth my complete knowledge or understanding of the facts related to this investigation.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only.  All figures, times, and calculations set forth herein are approximate.

## II.    <u>SUMMARY AND PURPOSE OF AFFIDAVIT: COMPLAINT & TELEPHONE TRACKING WARRANT</u>

4.    This affidavit is made in support of a criminal complaint against BAHRAM "SEAN" HASSANSHAHI a/k/a "Persian Sean" ("HASSANSHAHI") for violations of 18 U.S.C. §§ 1349 and 1028A (conspiracy to commit wire fraud and aggravated identity theft) and 21 U.S.C. §§ 846, 841(a)(1) (conspiracy to distribute fentanyl and methamphetamine).

5.    This affidavit is also made in support of an application for a warrant authorizing the disclosure of cell-site and GPS information, as well as the use of a cell-site

- 3 -

simulator, also known as a "Stingray," as defined or discussed within the application, at such intervals and times as the government may request, and the furnishing of all information, facilities, and technical assistance necessary to accomplish said disclosure unobtrusively, which disclosure will establish the approximate location of the following cellular telephone for a period of 45 days:

> a. (661) 379 2206, a cellular telephone issued by T-Mobile and used by BAHRAM "SEAN" HASSANSHAHI a/k/a "Persian Sean" (hereinafter **"SUBJECT TELEPHONE"**).

6.    As described more fully below, I respectfully submit there is probable cause to believe that cell-site information, GPS information, and information from a cell-site simulator, likely to be received concerning the approximate location of the **SUBJECT TELEPHONE** will constitute or yield evidence of the location of BAHRAM "SEAN" HASSANSHAHI and his conspirators (the "TARGET SUBJECTS") who are the subjects of an investigation of violations of 18 U.S.C. §§ 1349 and 1028A (conspiracy to commit wire fraud and aggravated identity theft) and 21 U.S.C. §§ 846, 841(a)(1) (conspiracy to distribute fentanyl and methamphetamine).

<u>Summary</u>

7.    BAHRAM "SEAN" HASSANSHAHI is a self-admitted fentanyl and methamphetamine dealer, with a criminal history to match.

His criminal records show he has been dealing drugs since at least 2004. HASSANSHAHI has also been ordered deported by U.S. Immigration authorities, but because he is a citizen of Iran, a country with no diplomatic ties to the US, he remains in the United States. HASSANSHAHI does not have a stable place to stay, he sometimes stays with his elderly mother but often switches between Airbnb rentals, friend's places, and hotels. HASSANSHAHI is on state probation, but as described in this affidavit, lied to his probation officer about his vehicle, residence, and telephone. He also continues to sell drugs like fentanyl and methamphetamine, and possessed a firearm despite being supervised by probation.

8.    In or around October 2022, HASSANSHAHI received hundreds of thousands of dollars of funds stemming from an identity theft victim, Robert Tascon, whose house was fraudulently sold without his knowledge or consent.  The victim later committed suicide.  Two other members of the conspiracy have pleaded guilty so far.  In reviewing escrow records for the fraudulently sold home, HASSANSAHI is listed as the seller for the property and signed as the "Special Power of Attorney" for the victim.

9.    In an interview, HASSANSHAHI admitted he received funds from the sale of victim Robert Tascon's home, but claimed he thought the sale was legitimate.  HASSANSHAHI said he used

- 5 -

the proceeds to fund his drug trafficking business. HASSANSHAHI claimed Robert Tascon owed him over $40,000, which is why he received money from the sale of his house, but could not explain why he got at least $180,000 in return.  HASSANSHAHI said he got the squatters to leave the property so it could be sold.

10.  In August of 2023, Ventura County Sheriffs executed a search warrant at HASSANSHAHI's residence at the time where they seized cash, fentanyl, methamphetamine, other drugs, and a firearm. He told the detectives he was a drug dealer and the drugs were for sale. This Ventura County case was turned over to me for federal prosecution.

11.  HASSANSHAHI is currently on state probation with a search condition. Probation also told me that HASSANSHAHI told his probation officer that he was a transient with no phone, residence, or car. Contrary to what he told probation, investigation has shown that HASSANSHAHI has a car (the HASSANSHAHI LEXUS), was living in an extended stay hotel suite and maintains a phone.  From my investigation, I know HASSANSHAHI is still involved in drug trafficking, which I believe explains why HASSANSHAHI has been lying to his probation officer.

12.  On April 17, 2024, Postal Inspectors again searched the extended stay hotel room where HASSASHAHI was staying. Found in his room was methamphetamine and a phone indicating he

- 6 -

was still dealing drugs.  During this search, I interviewed HASSANSHAHI and he again admitted to being a drug dealer.  He also told me the firearm he was previously caught with he used to protect his drug businesses. Text messages in his phone corroborate his statements that he is a drug dealer.

### III. <u>PROBABLE CAUSE STATEMENT</u>

#### A. <u>ID THEFT VICTIM HAS HOUSE STOLEN BY HASSANSHAHI AND OTHERS.</u>

13.  In or around 2021, Caroline Herrling ("Herrling"), Jason Kroth ("Kroth") and other co-conspirators (The "Herrling Conspirators") defrauded a victim of identity theft, Robert Tascon. Sometime around 2018, Robert Tascon moved to Texas while he was in a legal battle to evict squatters who illegally resided in his property in Encino, California.  According to the attorney for Tascon's estate, after Tascon won the eviction case, without Tascon's knowledge or approval, the Herrling Conspirators created a fake ID in Robert Tascon's name and forged power of attorney documents, as well as his signature, and sold the Encino property without his permission.  According to Tascon's common-law wife, due to his already on-going battle with depression and his lack of resources to fight the new legal battle to regain his Encino property, in September of 2022, Tascon committed suicide in his home in Texas.

#### B. <u>HASSANSHAHI SIGNS NOTARY AND ESCROW DOCUMENTS FRAUDULENTLY SELLING ROBERT TASCON'S HOME.</u>

14.  During the criminal investigation into the fraud

against Robert Tascon, I and other law enforcement obtained warrants for the residences of some of the Herrling Conspirators.  Found during the execution of these warrants were images of fake ID cards in the name of Robert Tascon bearing an impostor's face. In reviewing banking records and escrow documents, I observed a forged power of attorney document bearing Robert Tascon's name, which also had a fake notary stamp.  This forged power of attorney document purporting be signed by Robert Tascon granted a "Shawn Hassanshahi (HASSANSHAHI)" Special Power of Attorney to sell Tascon's property.  This document was submitted to the escrow company to facilitate the fraudulent disbursement of funds stemming from the sale of Robert Tascon's property.  Included in the escrow documents were multiple escrow documents signed by Shawn Hassanshahi on Tascon's behalf as the "seller".

15.  I also observed that about $360,000 from the sale of the property were deposited into an E*Trade account in Robert Tascon's name ("Tascon Fraud E*trade Account").  However the account opening documents were forgeries, including the same counterfeit ID I observed from the search warrants.

16.  Herrling and Kroth have both pleaded guilty to a conspiracy to commit wire fraud that encompassed the fraudulent sale of Robert Tascon's home.

17.  On April 17, 2024 I interviewed HASSANSHAHI.  During

this interview HASSANSHAHI told me he met Robert Tascon in prison. HASSANSHAHI said Robert Tascon moved to Texas and needed money. HASSANSHAHI said he loaned Robert over $40,000 which he claimed he sent to Robert Tascon in smaller amounts using Western Union. The Western Union transfers did not come from him but under the name of his friend "Ashley."

18. HASSANSHAHI said he knew Robert Tascon owned two homes, one in Van Nuys which burned down, and the one on Louise. One day, HASSANSHAHI said he called Robert to collect the money he claimed was owed to him. According to HASSANSHAHI, Robert Tascon verbally said he can get the money through the sale of, or a loan against, the Louise property. HASSANSHAHI said he only spoke with Robert Tascon about it that one time but he felt he got permission from Robert Tascon to sell the property. He did not speak to Robert again because Robert's wife, Miracle Williams, changed all of Robert's numbers. Coincidentally, around the same time, he said Kroth was already trying to sell the Louise house. Kroth introduced HASSANSHAHI to Herrling as an attorney who could facilitate the sale. He wasn't sure how Kroth learned of Tascon's property.

19. HASSANSHAHI did not know why they had to use fake notaries or fake identity cards to sell Robert Tascon's house. HASSANSHAHI added that there were squatters living in the Robert Tascon property. Kroth could not remove them. HASSANSHAHI said

- 9 -

he got the squatters to leave so that the property could be sold.

20.  HASSANSHAHI said there was an account into which he estimated about $300,000 of funds from the sale of Tascon's house was deposited (the Tascon Fraud E*trade Account). HASSANSHAHI said he got $100,000 from the sale.  When shown bank statements establishing that he actually got $180,000, he claimed that he did not recall and did not pay too much attention to his accounts at the time.  He said he used the funds to buy drugs for resale.

21.  I showed HASSANSHAHI records of transfers from the Tascon E*Trade account to others, including an employee of HASSANSHAHI who received $42,000 of the funds.  HASSANSHAHI admitted that the woman was his employee, and managed the smoke shop he owned; however, he denied knowing why she received funds from the sale of Robert Tascon's home.  He also denied getting the money from the employee after the funds were laundered through her account.

C. FINANCIAL RECORDS SHOWED HASSANSHAHI RECEIVED FUNDS FROM THE FRAUD.

22.  In April 2024 and previous times, I reviewed the financial records for the sale of Robert Tascon's house.  In or about October 2022, members of the conspiracy used a fake ID in the name of Robert Tascon to open an E*trade account in the victim's name (Tascon Fraud E*trade Account).  The Tascon

property was sold for about $1.5 million.  Of those funds, a check for $360,921.73 was issued by the escrow company payable to Robert Tascon.  On or about October 8, 2022, the $360,921.73 check was deposited into the Tascon Fraud E*trade Account.  The funds were then distributed among various subjects.

23.  In reviewing the transactions, I observed that between October 17 and October 25, 2022, in four wire transfers, HASSANSHAHI received $180,000 from the Tascon Fraud E*trade Account.  I also confirmed his employee got $42,000 of the funds.

D. SEARCH WARRANT EXECUTED AT HASSANSHAHI's FORMER RESIDENCE IN 2023.

24.  In April 2024, I spoke with a Ventura County Sheriff's Detective and read reports from that agency, from which I learned that in August of 2023, Ventura County Sheriffs executed a search warrant at HASSANSHAHI's residence at the time in Los Angeles.  During this search, narcotics investigators retrieved a total of $5,921 in cash, 212 gross grams of fentanyl, 35.2 gross grams of methamphetamine, 17 pills of alprazolam, 326 M30 pills, and one loaded firearm.

25.  HASSANSHAHI was interviewed by detectives.  During the recorded and Mirandized interview HASSANSHAHI stated:

a.  He was subletting the apartment for $3,000 a month and lived at the [searched premises] by himself. HASSANSHAHI said he had been selling drugs for a long time and

that it was the only way he could make money. HASSANSHAHI said he made about $3-4,000 a week selling methamphetamine and fentanyl. HASSANSHAHI told the detective he charges $450 for an ounce of fentanyl and "next to nothing for" an ounce of methamphetamine. HASSANSHAHI said a pound of methamphetamine goes for about $700. HASSANSHAHI said he picks up a couple "pieces" of fentanyl and half pound of methamphetamine every two to three days.

E. HASSANSHAHI IS SUPERVISED BY LA COUNTY PROBATION AND LIED TO HIS PROBATION OFFICER.

26.  From reviewing criminal records, I know that HASSANSHAHI was on Los Angeles County probation for gun and drug violations.  On April 15, 2024, I spoke to Probation Officer Percy Sanders who supervised HASSANSHAHI.  Probation Officer Sanders confirmed HASSANSHAHI was on probation and subject to search by law enforcement.  According to Officer Sanders, HASSANSHAHI told probation that he was a transient with no phone, residence, or car. As a result, HASSANSHAHI must physically check in with probation every week.

27.  However, my own checks showed that HASSANSHAHI had a car and a phone and was at the time staying at an extended stay hotel under a fake name, and had lied to his probation officer about all of this.

28.  In my training and experience, persons who are actively committing crimes repeatedly, such as drug dealers,

often lie to their probation officers about their residence,

vehicle, occupation, and telephones because they do not want

their probation officer to be able to track or investigate them.

This is especially true for persons like HASSANSHAHI, who has

probation search conditions.

F. <u>HASSANSHAHI IS HARD TO LOCATE BECAUSE HE STAYS IN HOTELS UNDER
   ASSUMED IDENTITIES.</u>

29.  My review of license plate records, AirBnb and hotel

records for HASSANSHAHI showed he often moves between hotels and

Airbnb rentals.  Airbnb records I reviewed include surveillance

photographs a host provided that showed HASSANSHAHI with other

men weighing what appears to me as pound quantities of illicit

substances in or around the summer of 2020.  The host had

complained to Airbnb that those guests were dealing drugs from

the host's rental, which based on my training and experience did

appear to be the case.  Some of the images also showed the men

holding or counting cash.  When shown the photographs,

HASSANSHAHI told me the drugs in the photographs were

methamphetamine and heroin.

30.  I reviewed DMV records and found a Lexus convertible

registered to HASSANSHAHI ("HASSANSHAHI LEXUS").  Eventually I

located the HASSANSHAHI LEXUS parked at "Sonesta ES [Extended

Stay] Suites" on April 15, 2024.

31.  On the morning of April 17, 2024, I visited the

Sonesta ES Suites and found the HASSANSHAHI's car again parked

- 13 -

in the hotel parking lot.

32.  At about 7:44 am, surveillance observed HASSANSHAHI walking around the parking lot and enter the hotel lobby.  I followed and watched HASSANSHAHI get food from the hotel breakfast buffet.  When HASSANSHAHI left the lobby, breakfast in hand, I approached him, identified myself as law enforcement, showed him my credentials and asked to speak with him.  He was cooperative and agreed.  I patted him down for weapons.  I did not find any.  I then asked if HASSANSHAHI was staying there, and he confirmed he was staying at room 1023 under his friend's name. HASSANSHAHI lead us to room 1023 where he pulled a key card out to open the door to the room.  I asked HASSANSHAHI if we could enter to conduct a safety sweep, he said yes and that no one else was in the room.  Inspectors Lee Versoza and Noah Thompson entered his hotel room to verify that no one else was in the room.  HASSANSHAHI confirmed that the room was rented under his friend's name, but that it was HASSANSHAHI's room.

G. <u>HASSANSHAHI CONFESSED TO DRUG DEALING AGAIN AND GUN VIOLATIONS.</u>

33.  HASSANSHAHI told me he was a drug dealer and sold drugs.  He bought drugs like methamphetamine and fentanyl pounds at a time and sold quantities less than a pound. I asked him if the fentanyl he sold was pure, he said no, that would kill people.  I asked him if he bought it pure then cut it to be less potent, he said, no he bought it already cut.  He said he bought

- 14 -

and sold fentanyl in rock form. (In a later interview,
HASSANSHAHI told me that to his knowledge, no one has died from
the fentanyl he sold.  He also said the most drugs he bought at
once was eight pounds of methamphetamine, and that he
occasionally sold by the pound.)

34.  When asked about the gun recovered from him by Ventura
Sheriffs, he said the gun was given to him.  As a drug dealer,
he said he needed the gun for protection of his drug business.
But he claimed he no longer sold drugs.

35.  I also asked HASSANSHAHI if I could search his phone,
and he agreed.  He completed two consent to search forms, and
acknowledged that he understood that he had a right to refuse to
provide consent.   (Although I am not a handwriting expert,
HASSANSHAHI's signatures for these consent forms had similar
traits to the signatures of 'Shawn Hassanshahi' found in the
Robert Tascon Escrow documents).  In the digital consent form,
he authorized me to conduct a "complete search" of his cellular
telephone, and provided its passcode.  He further authorized law
enforcement to make a "forensic image or copy" of its contents
and acknowledged that he understood it could be used against him
in court.  In searching his devices, I saw text chat of drug
sales.  When asked why I found text messages in his phone about
dealing drugs, he said people know him as a drug dealer which is
why people still reach out to him.  When asked why he responded

to the messages, he said he doesn't sell the drugs directly anymore; he was just a broker who used drivers to pick up and drop off his drugs.

H. ADDITIONAL SEARCH OF HASSANSHAHI REVEALED MORE DRUGS.

36.   Inspectors conducted a search of his hotel suite pursuant to his consent (and probation search conditions). Recovered on the TV Dresser and the nightstand of the bedroom were two baggies containing crystalline substances.  The crystalline was later tested using Trunarc which laser tests substances.  The device determined that the substances were positive for methamphetamine.  These baggies were later weighed grossing about 9 grams combined.

37.   When asked about the methamphetamine found in his hotel suite, he said he did not know who they belonged to.  He said they would probably have his fingerprints because he moved them around his room.

38.   When asked what he did for a living now that he said he was no longer selling drugs, HASSANSHAHI stated he was not doing anything, and his friend who rented him the room was helping him financially. He said he did not have a place to stay.

I. HASSANSHAHI HAS BEEN ORDERED DEPORTED.

39.   HASSANSHAHI later told me he had previously been ordered deported to Iran. However, he was never physically

- 16 -

removed from the United States.  He said sometimes he just thinks of returning to Iran voluntarily, because he has family there and a place to stay.

a.    On April 22, 2024, I contacted an Immigration Officer with United States Citizenship and Immigration Services ("USCIS").  The USCIS Officer confirmed HASSANSHAHI was ordered deported in 2015 by an Immigration Judge.  The officer said HASSANSHAHI is currently on some type of immigration supervised release. I know the US has no diplomatic relationship with Iran, preventing the deportation of Iranian citizens in most cases.

J. <u>DRUG DEALING TEXT MESSAGES.</u>

40.  ON April 22, 2024, I reviewed the forensic image of HASSANSHAHI's phone. From these records I observed that many if not most of HASSANSHAHI's thousands of messages were for drug dealing or collection of drug debts owed to him, some of which were threatening.  (HASSANSHAHI previously told me that he often uses voice to text which can sometimes explain the nonsensical grammar in these messages.) For example:

To HASSANSHAHI from -7906:    I have a person that wants to buy Thousand dollars worth of crystal stuff [i.e, methamphetamine] But I want to make sure I don't get ripped off

HASSANSHAHI responds:         3 quarter of pound [of meth for
                              $1,000]


TO HASSANSHAHI from -2249:    Lmk if I can pick up some
                              fent bc someone wants to buy off
                              of me


TO HASSANSHAHI from -0080:    Was wondering what's the ticket
                              for Fettuccine [fentanyl]?
HASSANSHAHI to -0080:         500
TO HASSANSHAHI from -0080:    The big whole plate [whole kilo]
HASSANSHAHI to -0080:         14000


HASSANSHAHI to -9257: Yes, still hasn't said anything. I'm not
                      joking around telling him i'm goingabout me
                      too I need my money 71340 thirteen hundred
                      and forty bucks all in fools


HASSANSHAHI to -4985:  Jose, this is your last for me. I want my
                       $1000. I'm sending Michelle to pick it up.
                       No I don't care where the f*** y** gonna get
                       it and that f****** snitch b******Do you
                       think I won't forget about all this s*** you
                       got me f***** u*How have my money ready

                            - 18 -

HASSANSHAHI to -9717: This is the guy u owe 2000 dollars to  you

                        got 1 week bring my money  thank you

K.    RE-INTERVIEW OF HASSANSHAHI

      41.  In June 2024, law enforcement attempted to interview
HASSANSHAHI.  During this interview HASSANSHAHI again admitted
to being a drug dealer.  However, although law enforcement knew
HASSANSHAHI conspired with certain suspects, when shown photos
of these co-conspirators, he stated he did not recognize them.


L.    TECHNICAL BACKGROUND REGARDING CELL-SITE SIMULATORS

      42.  Based on my training and experience and my
conversations with other agents and investigators, I understand
the following regarding cell-site simulators:

      43.  Cell-site simulators, commonly referred to as a
"Stingray," function by transmitting as a cell tower.  In
response to the signals emitted by the simulator, cellular
devices in the proximity of the device identify the simulator as
the most attractive cell tower in the area and thus transmit
signals to the simulator that identify the device in the same
way that they would with a networked tower.

      44.  A cell-site simulator receives and uses an industry
standard unique identifying number (e.g., Electronic Serial
Number (ESN), Mobile Equipment Identifier (MEID), International

Mobile Subscriber Identity (IMSI), International Mobile Equipment Identity (IMEI), Mobile Station Identity (MSID), Mobile Directory Number (MDN) or the Universal Fleet Member Identity (UFMI)) that is assigned by a device manufacturer or cellular network provider. When used to locate a known cellular device, a cell-site simulator initially receives the unique identifying number from multiple devices in the vicinity of the simulator. Once the cell-site simulator identifies the specific cellular device for which it is looking, it will obtain the signaling information relating only to that particular phone.

45. By transmitting as a cell tower, cell-site simulators acquire the unique identifying information from cellular devices. This identifying information is limited, however. Cell-site simulators provide only the relative signal strength and general direction of a subject cellular telephone; they do not function as a GPS locator, as they do not obtain or download any location information from the device or its applications. Moreover, cell-site simulators do not collect the contents of any communication. This includes any data contained on the phone itself: the simulator does not remotely capture emails, texts, contact lists, images, or any other data from the phone. In addition, cell-site simulators do not provide subscriber account information (for example, an account holder's name, address, or telephone number).

M. THE **SUBJECT TELEPHONE** IS USED BY HASSANSHAHI

46. As described above, HASSANSHAHI told me the **SUBJECT TELEPHONE** is his phone. On September 27, 2024, I called the **SUBJECT TELEPHONE** and HASSANSHAHI, whose voice I recognized, answered.

47. In my search of the data extracted **SUBJECT TELEPHONE**, I found evidence that showed the phone belonged to HASSANSHAHI, including photos of himself; the use of his nickname "Sean" in his messages; as well as his email address, which includes his street name, "persiansean."

48. Records checks show the **SUBJECT TELEPHONE** is tied to his mother's address in the Central District of California under a pseudonym.

49. In my training and experience, virtually every financial transaction generates a wire that crosses state lines. Most major corporations have data centers in different states to better protect their data from disasters. E*Trade, for example, is headquartered in Virginia and according to web postings has a data center in that state, but also uses one in Georgia. Further, financial transactions for one company, such as E*Trade, typically trigger corresponding transactions at others, such as the bank that receives an E*Trade transfer, generating more interstate wires.

N. <u>INTENDED USE OF THE CELL-SITE SIMULATOR AND DELETION OF
NON-TARGET DATA</u>

50.  Investigators intend to use the cell-site simulator to
send signals to the **SUBJECT TELEPHONE** that will cause the
**SUBJECT TELEPHONE,** and non-target cellular phones on the same
provider network in close physical proximity, to emit unique
identifying information, which the cell-site simulator will
collect.  Investigators will then use the information collected
by the cell-site simulator to determine the physical location of
the **SUBJECT TELEPHONE.** Investigators plan to use the cell-site
simulator to determine unique identifiers at multiple locations
and/or multiple times at the same location.

51.  Although the cell-site simulator will collect the
unique identifiers not only of the **SUBJECT TELEPHONE,** but also
identifiers belonging to nearby non-target cellular telephones,
these latter identifiers will not be used by law enforcement for
investigative purposes, just as the extraneous incoming and
outgoing telephone numbers necessarily recorded by conventional
pen registers and trap-and-trace devices are not used for
affirmative investigative purposes.  Absent further order of the
court, law enforcement will make no investigative use of
information concerning non-targeted cellular devices other than
distinguishing the **SUBJECT TELEPHONE** from all other devices.
Once law enforcement has located the **SUBJECT TELEPHONE,** it will
delete all information not associated with the **SUBJECT**

- 22 -

**TELEPHONE.**

52.   The cell-site simulator may interrupt cellular service of cellular devices within its immediate vicinity.  Any service disruption will be brief and temporary, and all operations will attempt to limit the interference with cellular devices.

O. TRAINING AND EXPERIENCE OF TELEPHONE LOCATION DATA

53.   In my training and experience, obtaining location data on the **SUBJECT TELEPHONE** will help me track that phone and, indirectly, the TARGET SUBJECTS.  This will help agents conduct surreptitious surveillance of the TARGET SUBJECTS, determine where they reside and what locations they employ in their schemes, including where they store the proceeds of their offenses.  It will also help me locate HASSANSHAI to arrest him.

P.   GROUNDS FOR NONDISCLOSURE ORDER

54.   Based on my training and experience and my investigation of this matter, I believe that reasonable cause exists to enter an order commanding the Carrier not to notify any person, including the subscriber of the **SUBJECT TELEPHONE**, of the existence of the warrant until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date the Carrier complies with the warrant or such later date as may be set by the Court upon application for an extension by the United States.  There is

reason to believe that such notification will result in
(1) flight from prosecution; (2) destruction of evidence, or
(2) otherwise seriously jeopardizing the investigation.

55.  Furthermore, there is good cause for the warrant to be
issued such that the information may be provided to law
enforcement at any time of the day or night because in my
training and experience, and knowledge of this investigation,
the TARGET SUBJECTS do not confine their activities to daylight
hours, and it is often even more difficult to conduct
surveillance at night.

## IV.  <u>CONCLUSION</u>

56.  For the reasons stated above, there is probable cause
to believe that BAHRAM "SEAN" HASSANSHAHI a/k/a "Persian Sean"
violated title 18 U.S.C. §§ 1349 and 1028A (conspiracy to commit
wire fraud and aggravated identity theft) and 21 U.S.C. §§ 846,
841(a)(1) (conspiracy to distribute fentanyl and
methamphetamine).

57.  For all of the above reasons, there is also probable
cause to believe that prospective cell-site information, GPS
information, as well as information from a cell-site simulator,
likely to be received concerning the approximate location of the
**SUBJECT TELEPHONE**, currently within, or being monitored or
investigated within, the Central District of California, will
constitute or yield evidence of the location of TARGET SUBJECTS

and aid in the investigation and/or arrest of the TARGET

SUBJECTS.


Attested to by the applicant in accordance
with the requirements of Fed. R. Crim. P. 4.1
by telephone on this __1st__ day of October,
2024.

_____
UNITED STATES MAGISTRATE JUDGE

- 25 -